UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**LEOLA (a/k/a Miki) RUTLEDGE,**

**Plaintiff,**

vs.                                                                    **Case No. 8:05-CV-536-T27TGW**

**SUNTRUST BANK,**

**Defendant.**

_____/

## ORDER

**BEFORE THE COURT** is Defendant's Motion for Summary Judgment (Dkt. 25), to which

the *pro se* Plaintiff has responded in opposition (Dkt. 28).[1] Upon consideration, Defendant's motion

is GRANTED.

### *Background*

The instant suit, brought pursuant to the Florida Whistleblower's Act ("FWA"), is based on

the events surrounding Plaintiff's resignation from Defendant SunTrust Bank in 2004. In brief,

Plaintiff alleges that shortly before her resignation, her supervisor repeatedly asked her to open new

customer accounts as checking accounts, rather than money market accounts, in order to improve

their branch's performance in a company-wide sales campaign. Plaintiff alleges that she was

retaliated against for reporting this conduct and that the retaliation led to her resignation.

Plaintiff began working for SunTrust in the early 1980s. (Pl. Dep. at 13; Kelley Dep. at 12).

---

[1] When this action was filed, Plaintiff was represented by an attorney. (Dkt. 1) Her attorney's motion to withdraw was granted on September 29, 2006. (Dkt. 18). Since then, Plaintiff has proceeded *pro se*. (Dkt. 19). At the time of Plaintiff's counsel's withdrawal, certain discovery had been conducted, including the depositions referenced in this Order. On January 22, 2007, the Court issued an order advising Plaintiff of the provisions of Rule 56, in accordance with *Johnson v. Pullman, Inc.*, 845 F.2d 911 (11th Cir. 1988). (Dkt. 27).

In or around 1990, she began working as an operations supervisor for new accounts at SunTrust's branch office in Auburndale, Florida. (Pl. Dep. at 18).  At some time thereafter, Plaintiff requested to return to her position as a financial services representative ("FSR"). (Pl. Dep. at 18).  Plaintiff remained a FSR until her resignation. (Pl. Dep. at 19).  The job responsibilities of a FSR involved general customer service, including opening new accounts. (Kelley Dep. at 15; Miller Dep. at 7-8). FSRs generally opened new accounts without a supervisor's approval. (Kelley Dep. at 15).  FSRs were paid a base salary as well as a monthly bonus based on the number, type, and value of new accounts that they opened during the prior month. (Watson Aff. ¶ 2).

During the events in question, Jennifer Miller, who was senior to Plaintiff, was the only other FSR employed at the Auburndale branch. (Kelley Dep. at 11-12).  Sherry Kelley was the supervisor of the Auburndale branch and was responsible for the day-to-day operations of the branch, including supervising Plaintiff and Ms. Miller. (Kelley Dep. at 9, 11).

Plaintiff alleges that beginning in September 2004, Ms. Kelley instructed her to open any new large money market accounts as checking accounts. (Dtk. 28 at 7).  Plaintiff alleges that this was done to enhance the performance of the Auburndale branch in the nationwide "2004 SunTrust Cup Business Banking Sales Campaign." (*Id.*)  The SunTrust Cup measured the performance of SunTrust's regions, area managers, business bankers, and individual branches by tracking the number and/or dollar value of loans, deposits, business credit cards, and checking accounts opened between September 1, 2004 and October 29, 2004. (Watson Aff. ¶ 6; Dkt. 25, Exh. 2).

Plaintiff alleges that Ms. Kelley became upset when she refused to open two new money market accounts as checking accounts. (Dkt. 28 at 7).  As a result of her refusal, Plaintiff contends that Ms. Kelley retaliated against her by: (1) opening a checking account under Plaintiff's user name

even though the customer had repeatedly requested a money market account; (2) giving Ms. Miller higher paying leads and bonuses; and (3) refusing to allow Plaintiff to rescind her eventual letter of resignation.

*1. Opening the checking account*

On September 29, 2004, the Auburndale branch was closed due to a power outage caused by a recent hurricane. (Pl. Dep. at 49-50; Kelley Dep. at 32). As a result, Plaintiff, Ms. Miller, Ms. Kelley, and other Auburndale employees worked out of the Haines City branch office. (Pl. Dep. at 50). Plaintiff called one of her SunTrust customers to ask her to bring a check to the Haines City branch in order to open a new money market account that they had previously discussed. (Howard Dep. at 5; Pl. Dep. at 51). The customer, Marjorie Howard, testified that she told both Plaintiff and Ms. Kelley that she wanted a money market account opened. (Howard Dep. at 5, 7, 30). Plaintiff also alleges that she told Ms. Kelley that Ms. Howard wanted a money market account. (Pl. Dep. at 54). However, Plaintiff alleges that Ms. Kelley told her to open the account as a checking account and that after they received credit for the SunTrust Cup, they would change it to a money market account. (Dkt. 28 at 7).

The other FSR at the branch, Ms. Miller, testified to these allegations as follows:

Q.    Have you ever -- were you aware at that time Miki Rutledge worked for SunTrust Bank that Sherry Kelley was telling Miki to open these checking account for people who asked for money market accounts, and then later switched them to money market accounts? That way the branch gets credit for opening the money market account.

A.    That's possible that that was done.

Q.    Did you ever do that yourself?

A.    I don't remember one that I did, but I may have done that, too.

3

Q.      Okay.  And was that practice encouraged by Sherry Kelley?

A.      I don't recall it being a practice, you know, that we did a lot of.  We may have
        done one or two.

It is undisputed that Ms. Kelley opened a checking account for Ms. Howard using Plaintiff's

computer before Ms. Howard came in to make the deposit, although Plaintiff was also in the office

at this time.  (Kelley Dep. at 31, 39).  By the time Ms. Howard arrived with the check, Plaintiff was

at lunch and Ms. Kelley assisted her.  (Howard Dep. at 5).  Ms. Kelley testified that Ms. Howard did

not specify the type of account she wanted opened, and that she thought a checking account would

meet Ms. Howard's needs as she understood them.  (Kelley Dep. at 34-38).  Ms. Howard's deposit

was for $197,950.00.  (Howard Dep. at 6).[2]

2.  *Leads and bonuses*

As noted above, FSRs earned bonuses based on the number, type, and value of new accounts

opened.  Ms. Kelley oversaw the distribution of any new account "leads" between Plaintiff and Ms.

Miller.  (Kelley Dep. at 42-44).  Leads that came in paper form or through the computer were divided

alphabetically between the FSRs.  (Kelley Dep. at 42-43, 51).  Walk-ins were divided alternately

between the FSRs.  (Kelley Dep. at 51).  Ms. Kelley also divided her own credits among Ms. Miller

and Plaintiff because supervisors were not entitled to bonuses for opening new accounts.  (Kelley

Dep. at 50).

Although Plaintiff complained in 2002 about the unequal distribution of leads between

herself and Ms. Miller, Plaintiff has repeatedly stated that the 2002 complaint is not at issue in this

---

[2] SunTrust later changed Ms. Howard's account to a money market account and paid her the interest that
she would have accrued had the account originally been opened as a money market account.  (Howard Dep. at 8, 34-
35).

litigation. (Dkt. 25, Exh. 5; Dkt. 28 at 12, Pl. Dep. at 68). Nor has she pointed to any details of those events in the record. With regard to the distribution of leads in 2004, Deborah Watson, the Vice-President of Human Resources for SunTrust, stated in her affidavit that during the first ten months of 2004, Plaintiff earned $3,476.29 in monthly bonuses, while Ms. Miller earned a total of $4,565.63 in monthly bonuses. (Watson Aff. ¶ 4, Exh. A). Defendant maintains that this difference in bonuses stems from that fact that Plaintiff was absent 51 days during this time period, while Ms. Miller was absent 21 days during the same period. (Watson Aff. ¶ 3).

The only specific instance of unfair lead distribution to which Plaintiff cites occurred on October 4, 2004 when Ms. Kelley opened certificates of deposit, a checking account, and a money market account for a customer named Mr. Lombardi. (Dkt. 28, Exh. 2). Ms. Kelley gave Plaintiff the $30.00 bonus from the money market account and gave Ms. Miller the $95.87 bonus from the checking account. (Dkt. 28 at 8). Plaintiff handed in her resignation that day.

*3. Plaintiff's resignation*

On October 4, 2004, Plaintiff left a typed resignation letter on Ms. Kelley's desk that read as follows:

> To SunTrust Bank:
>
> As of the above date, I am putting in my two weeks notice. My last working day is October 15, 2004. I do not want to speak to anyone local about the reason for my leaving. I may possibly speak to someone in human resources in Atlanta if I am asked to.

Ms. Kelley asked to speak with Plaintiff in her office, but because she was crying, Plaintiff told her she did not want to talk about her resignation and left work early. (Pl. Dep. at 77-78). One or two days later, Ms. Kelley asked Plaintiff if she was sure that she wanted to resign before she forwarded her resignation to the Area Manager. (Pl. Dep. at 78). Plaintiff answered in the affirmative. (Pl.

5

Dep. at 78).

Plaintiff's last day at SunTrust was October 12 or 13, 2004. (Pl. Dep. at 93). On October 12, 2004, Plaintiff's primary care physician, Dr. Ricardo Perez, provided her with a "Certificate to return to work/school," which indicated that Plaintiff was "not able to make correct decisions" due to her "severe stress/depression" and would be unable to return to work until November 7, 2004. (Dkt. 25, Exh. 7). Plaintiff called Ms. Kelley at home to tell her what Dr. Perez had said. (Kelley Dep. at 45). Plaintiff alleges that she also asked Ms. Kelley if she could take back her resignation (Pl. Dep. at 80), although Ms. Kelley disputes this (Kelley Dep. at 45-46, 49). Ms. Kelley talked to SunTrust's human resources department about Plaintiff's phone call. (Kelley Dep. at 49). Ms. Kelley called Plaintiff the next day and stated that they would not allow her to rescind her resignation but stated that she could reapply. (Pl. Dep. at 80, 91). Plaintiff has not alleged that she reapplied for the position.

Plaintiff states in her response in opposition to the motion for summary judgment that her resignation was due to:

> severe stress I was under for fear of what was going to happen to me when it was discovered that an illegal act had been committed and it looked like I did it, since Kelley opened the account under my user ID. I was so scared, knowing I could face personal monetary fines and convicted and imprisoned. The tension was so intolerable that I could not function normally or function as I normally did. (Dkt. 28 at 5).

4.    *Reports of misconduct*

In 1998 and 2001, Plaintiff acknowledged her receipt of the SunTrust Employee Handbook and SunTrust Code of Conduct. (Dkt. 25, Exh. 9). The Employee Handbook contained an Employee Appeal Process that Plaintiff testified she was aware of. (Pl. Dep. at 71; Dkt. 25, Exh. 8). The process required an employee with a grievance to follow a number of steps, including attempting

informal resolution with the immediate supervisor, submitting the concern in writing to the next

level manager, appealing to a local corporate representative, and finally, appealing to SunTrust's

corporate office.

Plaintiff alleges that she verbally complained about Ms. Howard's account to Lisa Spunger,

the Area Manager, before resigning, although she has provided no further details of this

communication. (Pl. Dep. at 63). After submitting her resignation, but before her last day, Plaintiff

called a SunTrust hotline and wrote to Charlie McPherson, a Regional CEO, and to Phillip Humann,

SunTrust's President. (Pl. Dep. at 69-70; Dkt. 25, Exh. 10). The letter, dated October 13, 2004,

stated, in part:

> By the time you receive this, I will no longer be employed by SunTrust Bank. The
> reason I am writing is to let you know the truth about why I left so you can hear
> straight from me and you will not have to wonder why I am doing what I must do
> now. . . .
> I have give [*sic*] up a job I loved and I have been at for 24 years, I gave up my income
> my insurance and all my other benefits that I have earned, and I gave them up
> because I refused to lie and cheat on my customer and I will not cheat on the Bank.
> (Dkt. 25, Exh. 10).

The letter described the events surrounding the opening of Ms. Howard's account and Mr.

Lombardi's accounts. On October 25, 2004, Mr. McPherson responded to Plaintiff's letter stating

that he was disappointed to learn of her resignation and that her concerns would be given

"appropriate consideration." (Dkt. 25, Exh. 11).

### *Standard*

Summary judgment is proper if following discovery, the pleadings, depositions, answers to

interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable

substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. Plaintiff's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Id.*

### *Discussion*

Plaintiff brings her claim pursuant to the private Florida Whistleblower Act ("FWA"), Fla. Stat. §§ 448.101 *et seq.*, which provides, in pertinent part:

> [A]n employer may not take any retaliatory personnel action against an employee because the employee has:
> . . .
> (3) Objected to, or refused to participate in, any activity, policy, or practice of the employer which is in violation of a law, rule, or regulation. Fla. Stat. § 448.102.

The legislative purpose of the FWA is to "protect private employees who report or refuse to assist

8

employers who violate laws enacted to protect the public." *Jenkins v. Golf Channel*, 714 So. 2d 558, 563 (Fla. 5th DCA 1998).

FWA claims are analyzed using the traditional *McDonnell-Douglas* burden-shifting framework employed in evaluating Title VII retaliation claims. *Bell v. Ga.-Pac. Corp.*, 390 F. Supp. 2d 1182, 1187 (M.D.Fla. 2005). To establish a prima facie case, Plaintiff must prove by a preponderance of the evidence that: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) the adverse employment action was causally linked to the statutorily protected activity. *Id*. at 1187-88. Defendant's primary argument in support of summary judgment is that Plaintiff resigned, and therefore, did not suffer an adverse employment action. As set forth below, the Court agrees.

1.    *Statutorily protected expression*

Taking the facts in the light most favorable to the Plaintiff, the Court finds that she did engage in statutorily protected expression. The Court will assume that the conduct of which Plaintiff complained, opening checking accounts rather than the requested money market accounts, constitutes a violation of a law, rule, or regulation. *See e.g.*, 12 C.F.R. § 230.5 (Truth in Savings Act requires notice to depositor of the terms of a new account and prior to changing terms of an account). Plaintiff alleges that she refused to participate in this activity. Plaintiff also alleges that she verbally reported Ms. Kelley's conduct to Ms. Spunger, the Area Manager, although the details of this communication, as Defendant notes, have not been elaborated on. Finally, Plaintiff reported her concerns in writing to Mr. McPherson, the Regional CEO, and Mr. Humann, the President, albeit in a letter dated October 13, 2004, which was her final day of work.

9

2.    *Retaliatory personnel action*

Plaintiff cannot, however, establish a prima facie case, because she did not suffer an adverse employment action.  A "retaliatory personnel action" is defined in the FWA as a "discharge, suspension, or demotion by an employer of an employee or any other adverse employment action taken by an employer against an employee in the terms and conditions of employment." Fla. Stat. § 448.101(5).  Plaintiff has alleged that she suffered an adverse employment action by virtue of Ms. Kelley's uneven distribution of leads and bonuses, Ms. Kelley's opening of Ms. Howard's account under her user name, the intolerable working conditions that these activities created, and SunTrust's refusal to rescind her resignation.

a.  *Plaintiff's resignation*

An employee's resignation is not an adverse employment action, absent evidence that it is the product of a constructive discharge.  *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 n.2 (11th Cir. 1997). In order to prove constructive discharge, Plaintiff must produce evidence that her working conditions were "so intolerable that a reasonable person in her position would have been compelled to resign." *Poole*, 129 F.3d at 553.  "[The standard for proving constructive discharge is higher than the standard for proving a hostile work environment." *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001); *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316-18 (11th Cir.1989) (affirming district court's conclusion that Title VII plaintiffs were subjected to hostile work environment, but were not constructively discharged).

The actions of which Plaintiff complains do not amount to a constructive discharge. Plaintiff's subjective feelings, including her "severe stress," about the conditions of her employment, are irrelevant.  *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1450 (11th Cir. 1998); *Huddleston*

*v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 905-06 (11th Cir. 1988) (finding no constructive discharge where employee quit because she believed co-employee had participated in vandalism of her daughter's ice cream truck and subjectively feared for her safety). In the instant case, the events that precipitated Plaintiff's resignation would not be found, by a reasonable person, to necessitate a resignation. *Cf. Poole*, 129 F.3d at 553 (finding issue of material fact where employee was stripped of responsibilities, given a chair and no desk, and isolated from conversations). Taking the facts in the light most favorable to Plaintiff, she has alleged that Ms. Kelley instructed her to open checking accounts instead of money market accounts on three occasions, which she refused, and that Ms. Kelley inequitably distributed a lead on the day of Plaintiff's resignation. These events are not so intolerable as to essentially force a reasonable person in Plaintiff's position to resign. *Cf. Durley v. APAC, Inc.*, 236 F.3d 651, 658 (11th Cir. 2000) (supervisor's alleged harassment about medically necessary absences and tardiness and smaller raise did not amount to constructive discharge).

Plaintiff had an obligation "not to assume the worst, and not to jump to conclusions too fast," *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987), and to allow SunTrust sufficient time to remedy the situation before resigning. *See Van Der Meulen v. Brinker Int'l*, 153 Fed. Appx. 649, 657 (11th Cir. 2005) (employee acted unreasonably in quitting without giving employer opportunity to respond as they had successfully done previously). Plaintiff had previously complained to management about other supervisors' behavior and had her concerns addressed.[3] However, when Plaintiff resigned on October 4, 2004, she gave Defendant little time to remedy the events occurring that day and on September 29, 2004.

---

[3] Plaintiff had reported alleged misconduct by a different supervisor to a SunTrust vice president in Lakeland. (Pl. Dep. at 25-26). Plaintiff also had successfully requested a transfer when she did not see eye-to-eye with another earlier supervisor. (Pl. Dep. at 23).

11

Plaintiff's later request to rescind her resignation is additional evidence that the working conditions were not intolerable. *Trinidad v. N.Y. City Dept. of Corr.*, 423 F. Supp. 2d 151, 168 (S.D.N.Y. 2006) (noting that employee's request for reinstatement established that working conditions were not intolerable). The Court also finds that Defendant's refusal to allow Plaintiff to rescind her resignation is not an adverse employment action under the facts of this case. *Jones v. Butler Metro. Housing Auth.*, 40 Fed. Appx. 131, 134 (6th Cir. 2002) (finding no adverse employment action where plaintiff became upset, quit, immediately came back to rescind her resignation, and employer refused to allow her to rescind); *MacLean v. City of St. Petersburg*, 194 F. Supp. 2d 1290, 1300 (M.D.Fla. 2002); *Hammon v. DHL Airways, Inc.*, 980 F. Supp. 919, 925 (S.D.Ohio 1997). One or two days after Plaintiff submitted her resignation, Ms. Kelley questioned Plaintiff as to whether she still wished to resign before she forwarded her resignation to the local corporate office, and Plaintiff answered in the affirmative. When Plaintiff did attempt to rescind her resignation over a week later, Ms. Kelley advised Plaintiff that she could reapply, which Plaintiff did not do. Plaintiff's October 13, 2004 letter to Mr. McPherson and Mr. Humann did not request reinstatement and repeatedly stated that she chose to leave her position.

Accordingly, the Court finds that Plaintiff resigned, that she was not constructively discharged, and that she suffered no adverse employment action.

*b. Other events*

Plaintiff has also alleged that Ms. Kelley retaliated against her by inequitably distributing leads and bonuses and by opening Ms. Howard's account under her name. An adverse employment action may consist of conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his

or her status as an employee." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). Conduct that falls short of an ultimate employment decision must meet "some threshold level of substantiality" and must be assessed on a case-by-case basis, under both a subjective and an objective standard. *Id.*

Plaintiff has identified only one instance of unequal distribution of bonuses with any particularity, which is the manner in which Ms. Kelley divided the bonus from Mr. Lombardi's three new accounts. This one-time inequity, without more, falls far short of an adverse employment action. Similarly, Ms. Kelley's opening of Ms. Howard's new account under Plaintiff's name does not by itself, nor in conjunction with the other activity of which she complains, rise to the level of an adverse employment action. These actions may well have been grounds for complaint to management, but they did not constitute substantial alterations in the terms of Plaintiff's employment.

### Conclusion

Plaintiff has failed to show that she suffered any adverse employment action and is therefore unable to maintain an action pursuant to the Florida Whistleblower's Act. Accordingly, it is

**ORDERED** and **ADJUDGED** that

1) Defendant's Motion for Summary Judgment (Dkt. 25) is **GRANTED**;

2) All pending motions, if any, are denied as moot;

3) The Clerk is directed to enter judgment on behalf of Defendant and to close the case.

**DONE AND ORDERED** in Chambers this _22^nd_ day of February, 2007.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
*Pro se* Plaintiff
Counsel of Record